MARTIN M. ABBRECHT, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Abbrecht v. Commissioner
Docket No. 19611-84.
United States Tax Court
T.C. Memo 1987-199; 1987 Tax Ct. Memo LEXIS 187; 53 T.C.M. (CCH) 611; T.C.M. (RIA) 87199; April 13, 1987. Michael A. Conway, for the petitioner. Margaret A. Satko, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency of $51,929 in petitioner's Federal income taxes for 1980. The issues for decision are: (1) Whether petitioner is entitled to ordinary loss treatment pursuant to section 1244, [1] on stock issued in his name from Classic Motors of Bloomfield, Inc.; (2) Whether petitioner is entitled to a short-term capital loss for a nonbusiness bad debt pursuant to section 166(d); and (3) Whether petitioner is entitled to a contribution deduction for clothing and furniture in excess of the amount allowed by respondent. *190 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Martin M. Abbrecht (petitioner) resided in Rochester, Michigan at the time of the filing of the petition herein. Petitioner, a physician, met Tom Turnas (Turnas) in late November 1979. Turnas operated a sole proprietorship known as Tom Turnas, d/b/a Classic Motors of Bloomfield (CMB), which was in the business of restoring and turbo-charging Corvettes. Petitioner became involved in CMB and began advancing money to Turnas. Starting in early December 1979, petitioner issued checks to CMB totalling $157,024.04. The advances by petitioner were not documented by either himself or Turnas. As of March 31, 1980, the balance sheet prepared by CMB's accountant, Neal S. Zalenko (Zalenko), showed total assets of $317,109.19, total liabilities of $335,659.86, and total owner's equity of negative $18,550.67. The liabilities portion of the balance sheet included only $91,993 as debt owed to petitioner. The balance sheet was compiled based upon the books and records of CMB. Information received by Zalenko subsequent *191 to the preparation of the balance sheet indicated that the financial condition of CMB was worse than presented in the balance sheet. The books and records of CMB did not reflect advances by petitioner in excess of $91,993. Turnas did not keep track of the amount petitioner advanced to CMB, but rather relied on petitioner to keep track of such amounts. On March 19, 1980, articles of incorporation for Classic Motors of Bloomfield, Inc. (CMBI) were officially filed and a charter granted by the State of Michigan. The only listed incorporator was Turnas. Approximately three days thereafter, in the normal course of business and mailing, the charter was received by Zalenko as accountant for CMBI. Approximately one week later, Zalenko delivered the charter to Turnas. Zalenko did not prepare an opening financial statement for CMBI. While the articles of incorporation for CMBI were drafted by Zalenko, Kenneth Afton (Afton), an attorney, drafted the corporate stock certificates, minutes, bylaws, and a stock redemption agreement. Afton had been engaged by petitioner. At the time of incorporation, petitioner and Turnas settled on $193,644.19 as the amount petitioner had loaned to *192 CMB. Neither petitioner nor Turnas retained records at the time which accurately documented this figure. The parties to the incorporation decided that petitioner would receive 450 shares of stock in exchange for $100,000 of the debt owed to petitioner by CMB and a promissory note in the amount of $93,644.19. Turnas received the remaining 550 shares of stock issued by CMBI. In the summer of 1980, petitioner made a demand for payment of the amounts loaned. Turnas claimed inability to pay and, on October 23, 1980, petitioner filed a complaint in the Circuit Court for the County of Oakland demanding payment of the entire $181,144.19 alleged as having been loaned to CMB and CMBI but not repaid. The amount claimed was less than the total amount alleged to have been loaned to CMB and CMBI because petitioner had received a 1965 Corvette in July 1980 which was valued at $12,500. The value of the Corvette was to be applied against the outstanding balance of the promissory note. On November 20, 1980, the parties entered into a settlement of the complaint whereby the 450 shares of stock held by petitioner were transferred back to CMBI in exchange for $1 and the promissory note was exchanged *193 for $25,000. Also, as part of the settlement, petitioner delivered a Corvette to CMBI and Turnas delivered another Corvette to petitioner. During the year 1980, petitioner also donated clothing and household items to the Salvation Army. OPINION On his return for 1980 petitioner claimed an ordinary loss in the amount of $99,999 as a result of his surrender of the CMBI stock and a short-term capital loss in the amount of $68,644 from the surrender of CMBI's promissory note. Petitioner also claimed charitable contributions in the amount of $13,588. By notice of deficiency, respondent disallowed the entire amounts claimed by petitioner as both ordinary loss and short-term capital loss with repect to CMBI and decreased the amount of petitioner's charitable contributions to $9,729. CMBI Losses
Section 1244(a) provides that in the case of an individual, a loss on section 1244 stock shall be treated as an ordinary loss if it would otherwise be treated as a loss from the sale or exchange of a capital asset. Section 1244(b) limits the amount of a loss which can be recharacterized by *194 the provisions of section 1244(a) for a taxable year to $100,000 in the case of taxpayers filing a joint return. Section 1244(c)(1) defines "section 1244 stock" as stock (1) which is stock in a domestic corporation which at the time of the issuance of the stock was a small business corporation, (2) issued for money or other property, and (3) which is stock of a corporation which, over a period designated therein, derived more than fifty percent of its gross receipts from sources other than certain types of passive income. [2]
Section 1.1244(c)-1(d), Income Tax Regs., provides that for purposes of section 1244, the cancellation of indebtedness of the corporation (other than that represented by a security) in exchange for section 1244 stock of the corporation is to be treated as an exchange of property. Section 1244(d)(1), however, provides that if the basis of section 1244 stock in the hands of the taxpayer is determined *195 by reference to the basis in his hands of property exchanged for such stock and the adjusted basis of such property immediately before the exchange exceeded its fair market value, then the taxpayer's basis in such stock, for purposes of section 1244(a), is to be decreased by the amount of the difference between the adjusted basis and fair market value of the property at the time of the exchange. Section 351(a) provides that no gain or loss is recognized when property is exchanged by one or more persons solely for stock or securities in a corporation if such person or persons are in control (within the meaning of section 368(c)) of the corporation immediately after the exchange. Prior to 1981, unsecured debt of a corporation was considered property within the meaning of section 351(a). Duncan v. Commissioner,9 T.C. 468 (1947). Cf. section 351(d), as amended by section 5(e)(1) of the Bankruptcy Tax Act of 1980, Pub. L. 96-589, 94 Stat. 3406. If section 351(a) is applicable to an exchange, section 358(a)(1) provides that the basis in the hands of the taxpayer of the stock *196 received shall be equal to the basis in the hands of the taxpayer of the property surrendered. Section 166(d) provides that in the case of a taxpayer other than a corporation, if a nonbusiness bad debt becomes worthless during the taxable year, the resulting loss is deemed to be a short-term capital loss. This provision generally applies to the surrender of a debt for an amount less than the taxpayer's basis in the debt. See Glenn v. Courier-Journal Job Printing Co.,127 F.2d 820 (6th Cir. 1942). Based on the above provisions, to determine the amount and character of petitioner's loss on his transactions with CMBI we must determine: (1) the amount of CMB's debt which petitioner has substantiated; (2) the basis in the hands of petitioner of the debt surrendered for the stock; (3) the fair market value of the debt at the time of the exchange; and (4) whether section 351 applies to the exchange of debt for stock by petitioner. [3]
*197 If section 351 applies to the incorporation of CMBI, petitioner will not recognize gain or loss at the time of incorporation. Petitioner's basis in the stock received will equal his basis in the debt surrendered. Sec. 358(a)(1). At the time the stock is surrendered, however, petitioner will recognize an ordinary loss pursuant to section 1244 equal to the difference between his amount realized, i.e., $1, and the lesser of either his basis in the stock at the time it is surrendered or the fair market value at the time of incorporation of the debt previously surrendered in exchange for the stock. Sec. 1244(d)(1). If the fair market value of the debt at the time of incorporation is less than petitioner's basis in the stock, petitioner will also have a short-term capital loss equal to such difference. See secs. 1001, 1221, 1222. The promissory note held by petitioner will produce a short-term capital loss at the time of the settlement of the complaint equal to the difference between his adjusted basis in the promissory note and the $25,000 received in settlement. Sec. 166(d). Petitioner has produced cancelled checks either written to CMB/Turnas or endorsed over to CMB/Turnas totalling *198 $157,024.04. Petitioner has not produced any records to evidence amounts loaned to CMB or Turnas in excess of this amount. Further, petitioner was the only witness at trial who testified as to the amounts of any cash payments made to CMB. Petitioner bears the burden of substantiating the amounts of his loans to CMB. Rule 142(a). [4] Petitioner has failed to substantiate any amounts loaned to CMB in excess of $157,024.04. Respondent argues that this amount must be further decreased by $40,000, alleging that petitioner loaned $40,000 to CMB which was money belonging to trusts established for the benefit of petitioner's children. Respondent bases his argument upon a statement allegedly made by petitioner to one of respondent's agents that $40,000 loaned to CMB/Turnas was taken from the trusts and upon a letter sent by petitioner to one of respondent's agents suggesting that $19,000 had been taken from the trusts and loaned to CMB/Turnas. There is no evidence that $40,000 was taken *199 from the trusts other than the testimony of respondent's agent about a conversation she had with petitioner. Documents included with a letter to respondent's agent, however, show that $9,500 was withdrawn from each of two trusts. Statements in the letter and circumstances surrounding the writing of the letter suggest that these amounts were loaned to CMB. Petitioner claims that the statements made in the letter were made for the sole purpose of demonstrating that he could raise a great deal of cash in a short period of time. After reviewing the letter, however, we find this explanation of the statements made therein to be implausible. We will therefore treat the amount of the loans from petitioner to CMB/Turnas which have been substantiated by petitioner as equal to $138,024.04 ($157,024.04 - $19,000). In determining petitioner's basis in his surrendered debt, we must consider the impact of petitioner's failure to substantiate a debt in excess of $138,024.04. As part of the incorporation of CMBI, petitioner accepted 450 shares of CMBI stock and a promissory note in the amount of $93,644.19. As the promissory note received by petitioner was simply an evidence of a preexisting *200 obligation, we do not view it as part of an exchange. Viewed in this manner, the property surrendered by petitioner in exchange for the stock was the amount of the debt in excess of that represented by the promissory note. Petitioner's basis in the debt surrendered in exchange for the stock was, therefore, equal to $44,379.85 ($138,024.04 - $93,644.19). The balance sheet prepared for CMB as of March 31, 1980, the day before CMB began operating as a corporation, i.e., CMBI, showed total liabilities in excess of total assets by the amount of $18,550.67. This balance sheet included only $91,993 of the debt owed to petitioner. There is no indication, however, that the asset side of the balance sheet did not include all or most of the amounts loaned by petitioner, including amounts loaned from the trust funds. Based on these figures, CMBI would appear to have been insolvent on the date of incorporation to the extent of $83,581.71. [5] Further, the accountant who prepared the balance sheet, Zalenko, stated that information he received after he had prepared the balance sheet suggested that the financial condition of CMB at that time had been worse than that shown on the balance sheet. *201 [6]
From the record, it is clear that the fair market value of the debt owed petitioner was substantially less than petitioner's basis therein. This debt, prior to the incorporation, was not evidenced in any manner and it is likely that most of the other debt shown on the balance sheet had priority over it. Petitioner has failed to demonstrate that the debt exchanged for stock upon the incorporation of CMBI had a fair market value in excess of zero. See Rule 142(a). Section 351 is applicable to the incorporation of CMBI. The only parties to receive stock upon the incorporation were Turnas and petitioner. *202 These two stockholders transferred property in exchange for their interests in CMBI and immediately following the transaction possessed 100 percent of the stock issued by CMBI. See secs. 351(a), 357(a), 368(c). See also Duncan v. Commissioner,supra.Therefore, petitioner recognized neither gain nor loss on the incorporation and petitioner's basis in the stock received was equal to his basis in the debt surrendered, i.e., $44,379.85. In summary, our conclusions up to this point are: (1) petitioner has substantiated loans to CMB in the amount of $138,024.04; (2) petitioner's basis in the debt surrendered for stock of CMBI was $44,379.85; (3) petitioner has not shown that the debt exchanged for the stock had any fair market value; and (4) section 351 does apply to the exchange in which petitioner acquired the stock. Based on these conclusions, petitioner did not recognize a loss on the exchange of debt for stock of CMBI at the time of the incorporation of CMBI. Petitioner's basis in the stock was equal to his basis in the surrendered debt, i.e., $44,379.85. Because the fair market value of the debt surrendered for the stock was not shown to be in excess *203 of zero, petitioner is not entitled to any ordinary loss upon the redemption of the stock at a loss. Sec. 1244(d)(1). Petitioner is entitled, however, to a short-term capital loss from the redemption of the stock in the amount of $44,378.85 ($44,379.85 - $1.00). Further, petitioner is entitled to a short-term capital loss pursuant to section 166(d) upon the surrender of the promissory note in the amount of $56,144 ($93,644 - $12,500 - $25,000). [7]
*204 Charitable Contributions
Petitioner claimed charitable deductions in the amount of $13,588 for items donated to the Salvation Army. Petitioner claims that such items were relatively new and that he valued them at twenty percent of their original cost. In his notice of deficiency, respondent disallowed $3,859 of the claimed deductions. Petitioner bears the burden of proving that respondent's disallowance of the claimed deductions was in error. See Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner has offered no evidence other than his own testimony with respect to the value of the items contributed. Petitioner's testimony established nothing more than his own opinion of the value of the items. As such, we must uphold respondent's determination with respect to the claimed charitable deductions. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect during the year in issue.↩
2. Respondent has not asserted that the requirements set out in section 1244(c)(1) for "section 1244↩ stock" are not satisfied in this case.
3. Respondent has argued that the exchange of debt for stock lacked sufficient business purposes or economic substance to satisfy the requirements of section 1244↩. Our holding in this case, however, makes it unnecessary to deal with this argument.
4. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
5. This is calculated as follows: ↩
Debt not shown on the balance sheet: Excess amount loaned by petitioner
($138,024.04 - $91,993.00)
=$46,031.04
Amount loaned from trust funds
=$19,000.00
TOTAL
$65,031.04
Insolvency shown on balance sheet
18,550.67
TOTAL INSOLVENCY
$83,581.71
6. Petitioner argues that if the inventory shown on the balance sheet had substantially appreciated, the corporation could have been solvent at the time it was incorporated. There is no evidence in the record, however, that the inventory had appreciated.↩
7. The parties have argued over the proper amount of this loss. On his return, petitioner claimed the amount of the loss as $68,644. Respondent claims that this amount was not reduced by the $25,000 received for the surrender of the debt. Petitioner points out that this amount is $25,000 less than the $93,644 face amount of the debt. This confusion appears to stem from the fact that prior to settling the debt petitioner received a Corvette valued at $12,500 and upon settlement of the debt petitioner surrendered a Corvette and received another Corvette. It appears that the parties assumed the values of the cars were equal. Petitioner's figure for the loss, however, would take into acount neither of the cars he received, while respondent would apparently take into account both cars and ignore the fact that petitioner was required to return one upon settlement of the debt. Our calculation for this loss assumes that the original face amount of the debt should be decreased by an amount of $12,500 representing the value of one car received by petitioner and $25,000 for the amount of the cash received by petitioner.↩